RICHMAN BROTHERS COMPANY, Plaintiff, v. AMALGAMATED CLOTHING WORKERS OF AMERICA et, Defendants.

Common Pleas Court, Cuyahoga County.

No. 641936.   Decided August 15, 1956.

## OPINION

By NICOLA, J.:

A short history of this case and its background may be helpful to us in its consideration.  The plaintiff, The Richman Brothers Company, hereinafter called "Richman," filed its action for injunction and relief in this Court on October 18, 1952.  On March 12, 1953, this Court overruled a motion by the defendants Amalgamated Clothing Workers of America, et al, hereinafter called "Amalgamated," to dismiss Richman's petition based on the claim that the National Labor Relations Board had jurisdiction of the case.

Thereupon Amalgamated appeared in the United States District Court and attempted to have this case removed to that Court on the ground that only a federal question was involved.  Judge McNamee refused to so order.  Then Amalgamated brought an original action in said District Court to enjoin this Court from proceeding in said case, claiming that the State Courts lacked jurisdiction of the subject matter, the same plea as made in the removal application.  On March 25, 1953, the District Court refused to enjoin this Court from proceeding.

On April 20, 1953, this Court entered a temporary restraining order against all picketing by Amalgamated.  At the time the restraining order was granted, the Court (Connell, J., then sitting on this bench) had before him the same essential facts in affidavit form as were disclosed at the trial before us.

The decision of the United States District Court in refusing to enjoin this Court from proceeding was later affirmed by the Circuit Court of Appeals after which on April 4, 1955 the Supreme Court of the United States refused certiorari (348-U. S.-643).

Thereupon the case came on for trial before another branch of

this Court of Common Pleas. In the trial of said case the motion of Amalgamated for dismissal of Richman action was granted on June 27, 1955, after opening statement of counsel. The Court in so deciding ruled contrary to ruling on the motion for restraining order entered by Judge Connell and decided that this case is within the sole jurisdiction of the National Labor Relations Board.

Our Court of Appeals disagreed and reversed said latter ruling on January 26, 1956 and remanded this case back to this Court to be tried on its merits.

Thereafter, to-wit, on June 5th to 14th, 1956, the trial was had before this branch of the Court. At the outset, after Richman's counsel had made his opening statement, counsel for Amalgamated moved for dismissal of the petition on the same grounds previously urged, to-wit, that this Court lacked jurisdiction inasmuch as the National Labor Relations Board had exclusive jurisdiction of labor disputes under the Labor Management Relations Act as the National Labor Relations Act as amended by the Taft-Hartley Act is denominated. By virtue of said Act, it was claimed the federal courts had pre-empted the whole field of labor relations where interstate commerce was involved, which latter fact was conceded.

This Court reserved its decision on the motion and stated that he would hear all the evidence and then render his decision on said motion and on the case as a whole.

The facts indicate that Amalgamated had been attempting to organize Richmans for many years but failed in its efforts. Then on March 31, 1951, without any notice, pickets appeared in front of the 18 stores of Richman located in 15 cities of Ohio and in front of about 51 stores of the same company located in fifteen other states. In a few locations, one or two regular pickets were used while in other places four to nine pickets were regularly used. From the evidence they were not members of Amalgamated or other unions but hired for the purpose of picketing. The exception was in Cleveland where union men were the pickets for about one week.

The picketing at the Richman stores in Cleveland is typical but less intensive than in some other cities. Mr. Amdur, Business Agent of the Cleveland Joint Board of Amalgamated and four other men appeared on the sidewalk in front of Richman's main store on Euclid Avenue near E. 9th Street—the busiest corner between New York and Chicago. Two men carrying signs walked abreast towards the east and two carrying like signs to the west. As they reached the center of the storefront, they turned around and walked the opposite way to the property line. Then they would repeat the process. Afterwards, they picketed in single file. They walked within six inches of the window. Their signs carried the legend—

"RICHMAN BROS. CLOTHES NOT UNION MADE.
BUY UNION MADE CLOTHES.
RICHMAN BROS. CLOTHES DO NOT HAVE A UNION LABEL.
BUY CLOTHES WHICH HAVE A UNION LABEL."

Picketing was continued with varying techniques till enjoined.

On Saturday, March 22, 1952, twenty additional pickets appeared

carrying banners and balloons filled with helium gas rising eight to fifteen feet above the ground with similar legends thereon. Led by Mr. Peppercorn, they started single file to circle in front of the store 3 to 4 feet apart. Thereafter, they milled around in front yelling and singing for 2-½ hours. This was not denied except by a business agent who said that the demonstration lasted ten to fifteen minutes.

Pickets told customers not to go into a "scab" store. This was not a union store and did not carry a union label. They interfered with traffic and occupied even the lobby and interfered with prospective customers who complained to the manager. After buying a suit, customers would bring it back after they talked with the pickets and demand a refund which the company granted. Other customers stated that they did not come in because of a picket line.

A similar demonstration was held on Saturday, March 29, 1952. Union men of other crafts would not cross the picket line and this was true of ordinary citizens. They thought there was a strike on at Richmans or that there was some trouble between it and the employees, and did not want to become involved in any way. Instances of the use of violent language are many.

What was true of Cleveland was true of Youngstown, Steubenville, Detroit, Chicago and St. Louis. In fact, the activities and demonstrations were more numerous and the regular pickets were more demonstrative and yelled at those who entered the store. The evidence shows that union men refused to deliver Richman's merchandise and the same had to be shipped by railway express; that repairs would not be made and the company was harassed in innumerable ways. An altercation occurred between the manager and Amdur when this business agent and four pickets went in the Cleveland store's lobby. The manager and the agent differed on the words used but there was no question of the physical encounter.

On the other hand Amalgamated stated that it was conducting an educational campaign for the adoption of the Union label. The picketing of Richman was ordered in convention. From their president down they all desired the campaign to be peaceful and so ordered. The theorist who apparently set up the technique of picketing and harrassment by demonstration was Howard D. Samuels of New York City, a suave young college man who had written a book on "Congress At Work," but had as far as the evidence disclosed, no labor experience whatsoever. He testified under oath with apparent candor that he was the director of the union label campaign since August 12, 1952. He conferred with the top union men and then determined the technique to be followed. The campaign was directed against the company to show the employer **that it would be to the best interest** of the company to end its **objection to unionization.** But there was not a shred of evidence that Richman ever objected to their employees joining the union. He drew up leaflets for the employees. Demonstrations were to advance the Amalgamated's publicity, not intended to keep people out of the store. The hurdy-gurdy atmosphere created by the balloons was set for Saturdays and other days when the store was busiest. He naively said that every effort

was made to show that **this was not a labor dispute and that union members could go through a picket line.** But, of course, he was not there when the demonstrations took place.

To the same effect was the testimony of Goldstein, another top organization man from Detroit. Organizer Corcoran, from the Steubenville-Pittsburgh district, testified that he added more pickets when more shoppers were on the street and that pressure was used against Richman so that he would **contract for the use of the union label** and thus would be forced to unionize his plant. He used seven demonstrations with from nine to twenty-one men marching four to five feet apart in front of the Pittsburgh store from 7:30 to 9:00 P. M. when the store closed. The last demonstration was held in April of 1952 even after the injunction had been granted by Judge Connell.

The evidence is conclusive to us that the technique devised was to picket steadily with a few and then follow up with a demonstration at Richman's busiest time. There is no question that they tied up the store completely during the demonstrations. The objective was to force Richman to contract with Amalgamated for the Union label which necessarily would compel unionization of Richman's plant and stores.

A false impression undoubtedly was caused by the picket line. It meant to passers-by and prospective customers that Richman was having trouble with its employees and that either there was a strike or trouble over wages or working conditions. We agree with Judge Connell when he says—

"Such banner may be innocent and harmless and may express absolute truth; but such banner on the doorstep of seventy stores, continuously for two years, may very well create a mental impression on the part of the public which is not at all contained on the banner. It may well be that Amalgamated has here figured out an ingenious devise for creating in the public mind, including those who drive for unions, those who are members of unions, and those sympathetic to unions, the impression that a legal dispute exists between the company and the amalgamated; that the company does not treat its employees fairly; that something is amiss, which causes its employees to place a picket line before the door of the company; that the company and its employees are having a dispute over working conditions or wages of its employees and that a strike is in actual progress.

"* * *

"Whoever invented this ingenious method of deriving benefits from the false impressions did not have advertising in mind as his primary purpose. The whole procedure * * * smacks of a psychology entirely foreign to ours. * * *"

What then is the applicable law to the factual situation above recited? In our quest we have been aided by exhaustive briefs of counsel, and have read a plethora of cases wherein the reasoning appeared to be logical but sometimes so refined as to become elusive. We have threaded our way through them in order to come up with an answer which is correct,—at least the answer herein found is the best this Court can give. We know full well, however, that we have not exhausted the sub-

ject and we also know that our decision will not be the last word on the subject. Starting with our own state courts, we find that in 1923, our Supreme Court laid down the following general rule:

"Picketing the plant of an employer by strikers during a strike, and peaceful discussion with and persuasion of employees to leave their employment, which under the terms of their contract is terminable at will, and peaceable persuasion of men applying for employment not to work for that particular employer, if unaccompanied by physical violence, abuse, intimidation, or any form of coercion or duress. direct or indirect, are not unlawful and cannot be enjoined." **(The LaFrance Electrical Construction & Supply Co. v. International Brotherhood of Electrical Workers, Local No. 8, et al., 108 Oh St 61—1923.)**

In State, ex rel. v. Commission, 125 Oh St 301-303 (1932), the Court quoted with approval the following statement from La France supra:

"Equality of justice demands that in any controversy the rights of all parties be scrupulously maintained. The right of workmen to be employed, irrespective of union membership, must be maintained; the right of employer to conduct his business without illegal interference must be upheld; and legal means employed by strikers must not be curtailed."

Then we reach the case of Crosby v. Rath, et al, 136 Oh St 352 (1940).

The controlling question, the Court said, is whether the evidence disclosed "the existence of a legitimate trade dispute." The record discloses that Crosby's employees did not belong to a union, though they were not prohibited in any way. They had a contract with Crosby renewable every three months. The union picketed her restaurant though there was no complaint from the employees, all of whom had been solicited but did not join a union. From 40 to 100 persons were engaged in picketing her place of business. Vile and obscene names were called, entrances were obstructed. They threatened, assaulted, struck and injured some of her employees and did many other acts of violence.

The Court of Common Pleas rendered a decree enjoining the picketing. The Court of Appeals affirmed in part. It held violence should be enjoined but peaceful picketing permitted. The Supreme Court reversed to the extent the Court of Appeals decree permits violent picketing and boycotting. It rendered final judgment in conformity with decree of Common Pleas Court. Thus all picketing of the union was proscribed.

In the case of W. E. Anderson Sons Co., v. Local Union No. 311, et al, 156 Oh St 541 (1952) it was held—

"Syl. 4.—Picketing or bannering as a means of exercising the right of free speech will be afforded constitutional protection so long as it is lawfully conducted, but the right of free speech is predicated on the lawful exercise of such right, and if, through conspiracy or unlawful conduct, the result of its exercise by such means unlawfully injures another in his property rights, the guaranty ceases and the exercise of the claimed right by such means may be enjoined or prohibited."

Judge Hart in his opinion reviews meticulously the decisions of both federal and state courts  So that we can conclude that picketing may be used in Ohio where a **labor dispute exists between an employer and**

employees if peaceably conducted,—that is without direct or indirect coercion.

The Ohio law was as above set forth when the injunction against any picketing in the instant case was granted by Judge Connell on April 14, 1953.

In the meantime, nationally, the Wagner Act was succeeded by the National Labor Relations Act which was amended in 1947 by the Taft-Hartley Act. It then became known as the Labor Management Relations Act.

On October 20, 1953, the Supreme Court of the United States handed down its decision in Garner v. Teamsters Union, 346 U. S. 485. This case looms large in the field of labor relations and will need to be carefully analyzed. In the words of the Supreme Court, the—

"Petitioners were engaged in the trucking business * * * The trucking operations formed a link to an interstate railroad. No controversy, labor dispute or strike was in progress, and at no time had petitioners objected to their employees joining the union. Respondents (union), however, placed rotating pickets, two at a time at petitioners loading platform. None were employees of petitioners. They carried signs reading 'Local * * * wants employees of Central Storage & Transfer Co. to join them gain union wages, hours and working conditions.' Picketing was orderly and peaceful, but drivers for other carriers refused to cross a picket line and, as most of petitioner's interchange of freight was with unionized concerns, their business fell off as much as 95%. The courts below found that respondents' purpose in picketing was to coerce petitioners into compelling or influencing their employees to join the Union."

Pennsylvania had a statute somewhat different from the Labor Management Relations Act which statute forbade labor unions to exert certain types of coercion on employees through the medium of the employer. The trial court applied the Pennsylvania law and enjoined the union in pursuit of its goal. The Supreme Court of that state reversed the trial court on the ground that the petitioners should apply to the National Labor Relations Board for relief. The Supreme Court of the United States then affirmed said decision. The question as put by the Supreme Court of the United States is—

"Whether the State, through its courts, may adjudge the same controversy and extend its own form of relief."

In this case, the answer was that the state could not do so.

Counsel for Amalgamated deduces from the above holding, and, therefore, argues, that the whole field of labor relations has been preempted by the Labor Management Relations Act (Taft-Hartley) to federal authority and that jurisdiction in all labor disputes is given to the National Labor Relations Board.

Since this is Amalgamated's claim it may be helpful to set out the pertinent part of the Statutes.

"SECTION 7 NATIONAL LABOR RELATIONS ACT as amended (29 USCA Section 157): 'Employees shall have the right to self-organization, to form, join, or assist labor organizations, * * * and shall also have the right to refrain from any or all of such activities * * *.'

"SECTION 8 NATIONAL LABOR RELATIONS ACT as amended (29

USCA Section 158): '(a) It shall be an unfair labor practice for an employer—. . . (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization:

\* \* \* \* \* \*

" '(b) It shall be an unfair labor practice for a labor organization or its agents—(1) to restrain or coerce (A) employees in the exercise of the rights guaranteed in Section 157 of this title: \* \* \* or (B) an employer in the selection of his representatives for the purposes of collective bargaining or the adjustment of grievances; (2) to cause or attempt to cause an employer to discriminate against an employee in violation of subsection (a) (3) of this section or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated on some ground other than his failure to tender the periodic dues and the initiation fees uniformly required as a condition of acquiring or retaining membership.

\* \* \* \* \* \*

" '(c) The expressing of any views, argument, or opinion, or the dissemination thereof, whether in written, printed, graphic, or visual form, shall not constitute or be evidence of an unfair labor practice under any of the provisions of this subchapter, if such expression contains no threat of reprisal or force or promise of benefit.' "

Adverting again to our State decisions, we find that before the Garner decision, supra, our County Courts had considered and decided the case of **Grimes and Hauer Inc., v. Pollock (CP 65 Abs 499, OA 71 Abs 153, 154)**, wherein the following facts were disclosed by the evidence. The plaintiff, a poultry corporation, had seven outlets in Cleveland for sale of processed chickens brought here in refrigeration. It had a total of 25 employees at these various outlets which the defendant attempted to unionize but failed in its attempt. Nevertheless, the defendants peacefully picketed these stores, the pickets carrying signs which read—

"This Market Does Not Employ Union Help. Please Do Not Patronize."

The Common Pleas Court and Court of Appeals both enjoined the picketing. Before the case reached the Supreme Court of Ohio, the Garner decision, supra, was handed down by the Supreme Court of the United States. Thereupon our Court of Appeals entertained a motion for rehearing and reconsideration of Grimes & Hauer and reversed its previous decision upon the grounds that said case came under the rule set by the United States Supreme Court in Garner. The Supreme Court of Ohio affirmed this action in its decision handed down on May 25, 1955 and reported in 163 Oh St 372. The Syllabus reads—

"Because of the decision of the Supreme Court of the United States in the case of Garner v. Teamsters, Chauffeurs & Helpers local Union No. 776, 346 U. S., 485, where a labor union is in dispute with an employer engaged in interstate commerce over the unionization of the employer's nonunion employees, and the union pickets the business locations of such employer in an orderly and peaceful manner, a state court is without jurisdiction to enjoin the picketing; a controversy of this kind comes

within the provisions of the Labor Management Relations Act (Section 151 et seq., Title 29, U. S. Code), as it relates to unfair labor practices; and the employer must, initially at least, pursue the remedy of presenting his grievance to the National Labor Relations Board."

In the Grimes case our Supreme Court did not state in its syllabus that Taft-Hartley pre-empted the entire field of labor relations. However, in the opinion of the member writing said opinion, our elder and much admired member of the Court, appears the following on page 377:

"So far as we can ascertain, the Garner case represents the latest pronouncement of the Supreme Court of the United States directly on a set of facts resembling those in the instant case (Grimes & Hauer) and lays down the rule that a state court does not possess the power to enjoin union conduct, such as the picketing of an interstate employer's premises to induce the unionization of its employees, since such activity presents the question of an unfair labor practice within the meaning of Labor Management Relations Act which, initially at least, **is exclusive**."

In Garner, the construction of a state statute of Pennsylvania somewhat different from the Federal Statute was involved. The Supreme Court of the United States affirmed that the Supreme Court of that state was correct when it found that the Federal statute prevailed over the State statute and that the case therefore came under the Labor Managment Relations Act.

That full pre-emption was not intended the Court itself on page 488 gave two exceptions. It also pointed generally to other exceptions. These exceptions were summarized by our Court of Appeals in reversing another branch of this Court in the instant case. It sets out the exceptions as follows; where:

"1. there is injurious conduct which the Board is without express power to prevent and therefore must be governed by the State or it would be entirely ungoverned.

"2. there is a case of mass picketing, threatening of employees, obstructing streets and highways, of picketing homes.

"3. there is a probable breach of the states peace.

"4. * * *, or that the Board would decline to exercise its powers once its jurisdiction was invoked."

Our Court of Appeals held further that the allegations of the petition in the instant case are such as clearly to distinguish the same from Garner and Grimes & Hauer which suggests an area for the exercise of State authority under Ohio law. It was for the reasons given that this case was remanded to this Court for trial on its merits.

The last case handed down by the United States Supreme Court (June 4, 1956) is that of United Automobile, A. and A. I. Workers of America v. Wisconsin Employment Relations Board and the Kohler Co. In this case the employees and the Kohler Co. could not resolve their differences by collective bargaining and the employees struck and picketed the Kohler plant. On application to the Wisconsin Board, under the Wisconsin Peace Act, the Board ordered the strikers to cease and desist in mass picketing and intimidation of interstate employer's non-striking employees. The Union thereupon appealed to the United States Supreme Court which held:

Syl. "Taft Act's subjection of Union's unfair labor practices to federal control, does not deprive Wisconsin Court of power to enforce Wisconsin Employment Relations Board's order forbidding unions mass picketing and intimidation of interstate employer's nonstriking employees."

The facts show there was a strike by employees of an interstate employer, clearly and admittedly coming under the federal act, yet the state was not deprived of its power to regulate the activities through the state Board. The Court in its opinion says—

"The appeal urges that this amendment (Taft-Hartley) eliminated the state's power to control the activities now under consideration to State Labor statutes. It seems obvious that Section 8(b)(1) would not be the exclusive method of controlling violence even against employees, much less violence interfering with others approaching an area where a strike was in progress. No one suggests that such violence is beyond state criminal power. The Act does not have such regulatory pervasiveness. The state interest in law and order precludes such interpretation. Senator Taft explained that the federal prohibition against union violence would allow state action."

Previously it had been held that acts of violence in labor disputes were unfair labor practices and only would be handled by the National Labor Relations Board. This the Court refutes and says—

"As a general matter we have held that a State may not, in the furtherance of its public policy, enjoin conduct, 'which has been made an unfair labor practice under the federal statutes.' * * * But our post Taft-Hartley opinions have made it clear that this general rule does not take from the States power to prevent mass picketing, violence, and overt threats of violence."

It will be observed that in the Wisconsin case, supra, both Wisconsin and the Federal Government had provisions for regulating mass picketing just as both the State of Pennsylvania in the Garner case and the Federal Government had regulations on the facts as they appeared in Garner.

It must be noted that the facts in the two cases are different in this —in Garner the picketing was not violent though 95% coercive, while in the Wisconsin case violence prevailed with mass picketing but apparently was not so coercive. However, this was a ruling from which three justices dissented.

Mr. Justice Douglas wrote the dissenting opinion which (in part) says:

"Here the State has prescribed an administrative remedy that duplicates the administrative remedy prescribed by Congress. Each reaches the same identical conduct. We disallowed that duplication of remedy in Garner v. Teamsters Union, 346 U. S. 485, 33 LRRM 2218. In that case we held that a state court could not enjoin action which was subject to an unfair labor proceeding under the federal Act. And see Weber v. Anheuser-Busch, Inc., 348 U. S. 468, 35 LRRM 2637. Today we depart from Garner and allow a state board to enjoin action which is subject to an unfair labor proceeding before the federal board. We sanction a

precise duplication of remedies which is pregnant with potentialities of clashes and conflicts."

Whether the Supreme Court of the United States has actually departed from the Garner ruling, as asserted by the three dissenting justices, is not for us to say. It is sufficient here to note that the above case, the last expression of the Supreme Court fully establishes that the field of labor relations was not pre-empted by the Labor Management Relations Act as asserted by counsel for Amalgamated.

There are many other exceptions to the theory of total pre-emption some of which are cited by Taft, J. in **Chucales v. Royalty, 164 Oh St 214.** These citations need not be repeated here in view of the above ruling.

The next question that we will consider is whether or not there was such a labor dispute in the instant case that would impel the NLRB to grant appropriate relief. If there was not such a dispute in Richman, in equity, it would not be compelled to do a futile thing. This our Court of Appeals noted in remanding the instant case. See also Building Trades Council v. Dinard, etc., 346 U. S. 933 (1954).

The most recent case on the subject as far as we can discover is that of J. J. Newberry Co. v. Retail Clerks International Assn. No. 8339, on the docket of the Supreme Court of Idaho and decided by that tribunal on June 4, 1956.

In that case the union claimed to have a majority representation of the employees of Newberry's store in Pocatello, and filed a petition for an election with the NLRB. The election was scheduled then for August 13, 1952. On August 12th, the day before the election, the employees of Newberry's informed the secretary and treasurer of the union that none of the employees would attend the meeting and none would vote for the union. Thereupon the union withdrew its request for an election and went direct to the NLRB claiming that it represented a majority of the employees at Newberry's and that the company had refused to bargain with the union and had dealt directly with the employees on the subject of wages and other conditions of employment without giving the union's representatives an opportunity to be present; that Newberry had refused to recognize the Union as the exclusive representative or bargaining agent of Newberry's employees and had committed unfair labor practices in violation of Sec. 8(a)(1) and (5) of the National Labor Relations Act. Newberry denied the commission of the acts complained of. Hearing on the charges and the Regional Director's complaint made pursuant thereto, was held on January 13, 1953. The trial examiner found all the issues in favor of Newberry, and specifically found that Newberry did not interfere with, restrain or coerce its employees within the meaning of the National Labor Relations Act, and recommended that the complaint be dismissed in its entirety. This was done.

In Newberry the claims made by counsel for the union were found to be untrue. What was there found to be untrue is here admitted, that is, that there is no majority or even anyone in Richman's that belongs to the union. Consequently, the facts in effect are the same.

In Newberry after the National Labor Relations Board approved the

findings and recommendation of the examiner and dismissed the proceedings, the Union placed a picket to patrol the outside of the sidewalk at the entrance and in front of Newberry's store, carrying a sign which read:

"MEMBERS & FRIENDS OF ORGANIZED LABOR WE NEED YOUR HELP Please Shop At The Stores That Display This Sign."

(Facsimile of Union store card or emblem)

"OUR MEMBERS DO NOT PATRONIZE NEWBERRY'S Retail Clerks Union LOCAL No. 560."

Thereafter the said Union placed Newberry on the unfair list. Thus we have a similar situation as in the instant case, except that in Richman there is the additional fact that violence was used.

Newberry filed an action in the State Court praying for a restraining order. This was issued and picketing pending the hearing was enjoined. The same claim was made in that case as was made in the instant case that the matter was one for the NLRB since the field had been pre-empted by the Act of 1947 (LMRA) and that the injunction violated the union's rights under the 1st and 14th Amendments to the federal constitution.

The lower Court found in Finding No. IX—

"That the purpose of placing said picket by the defendant union was unlawfully to intimidate, coerce and compel plaintiff to enter into an agreement with defendant union, and by the use of economic coercion by defendants, to destroy plaintiff's freedom of contracting."

The Supreme Court of the state sustained the lower court ruling and made the injunction permanent and said in its opinion—

"The activities and conduct of the Union here complained of have neither been approved nor prohibited by the National Labor Relations Act and are not within the categories covered therein."

Also that—

"The right to engage in business or follow any lawful calling is a right open to all persons, together with the further right to conduct such business or calling without unlawful interference from others."

If there was no labor dispute in Newberry, there is no labor dispute in Richman. If, therefore, Richman applied to NLRB, its complaint would be dismissed. It seems to us that Richman's contention that it would be futile to apply to the Board for relief, is fully sustained.

But counsel for Amalgamated in his letter brief of June 26, 1956, calls to our attention the case of Lauf v. Shinner & Co., 303 U. S. 323, which is rather disconcerting. We think the answer is that the Supreme Court of the United States was concerned more with the interpretation of the Wisconsin state law than anything else. It says—

"As the acts complained of occurred in Wisconsin, the law of that state governs the substantive rights of the parties. (Page 327) * * * The District Court was bound by the construction of the section (of Wisconsin law) by the Supreme Court of the state, which has held a controversy indistinguishable from that here disclosed to be a labor dispute within the meaning of the (Wisconsin) statute."

We believe the later decisions of the Supreme Court of the United

States above cited cover the situation in Richman and make for a better understanding thereof.

It is urged, but not strenuously, that to enjoin Amalgamated in the instant case would infringe on its constitutional rights under the 1st Amendment to the Constitution. This has been refuted in many cases. We will confine ourself to the cases of Hughes v. Superior Court, 339 U. S. 460 (1950) wherein the Court says:

"The Fourteenth Amendment does not bar a state from enjoining peaceful stranger picketing, the sole object of which is to enforce compliance with a demand that the employees of the business be hired in proportion to the racial origin of its clientele. The state Supreme Court had affirmed a narrowly drawn injunction on the ground that the public policy of the state forbid such conduct because it would encourage discriminatory hiring. In its opinion the Supreme Court emphasizes; (a) that picketing is more than free speech since the presence of a picket line may lead to action of some kind regardless of the nature of the ideas being disseminated and (b) that the fact that the state public policy had been expressed by the judiciary rather than by the legislature was wholly immaterial."

From the above and other cases we see that federal courts will follow the state public policy expressed either by the legislature or by the judiciary.

But where do the above decisions applied to the facts disclosed by the evidence in the instant case lead us?

Isaacson in his brilliant article (Am. Bar Ass'n Journal of May 1956, p. 420) digests and comments on the important cases in this field of the law. He quotes Justice Frankfurter in the Richman decision that the "ascertainment of pre-emption under Taft-Hartley Act is (neither) self-determining (nor) even easy;" the line of demarcation between the area of exclusive federal power and allowable state jurisdiction is indeed "rather subtle." (Then he follows with his own views.) "That under these circumstances the state courts would frequently blunder. The best intentions of state court judges could not supply that degree of knowledge and familiarity essential to an understanding of the complex subject."

His comment about state courts may be correct in a very great measure. This court has studied this case for over a month and we hope we see a little light. But we cannot resist saying here that the eminent Justice above quoted was one of the six Supreme Court Justices whom the dissenters in the Wisconsin case supra claimed had departed from Garner.

We have in the instant case Amalgamated, an outside union, through stranger picketing, attempting to coerce Richman to contract with the union for the use of its "Union label." This would necessitate the unionization by Richman of its employees. If the employees would not join the union, Richman, to keep its contract, would have to discharge them, thus committing a "discrimination" under the Taft-Hartley Amendment.

It is clear that the "mandate" came from the Union's convention,

was considered and implemented by its officials and the orders were given to Peppercorn and other Cleveland representatives to proceed in the manner agreed upon, to unionize Richman. Call it a "conspiracy" or call it a "plan," its ultimate object was the same. What Peppercorn had not been able to do at the factory for more than ten years would be accomplished by this plan.

It is now clear from the Hughes case, supra, to the last Wisconsin case, above mentioned, that the Supreme Court of the United States, will interpret a state's policy as the state courts interpret that policy,— whether that policy is one declared by the legislature or declared by the judiciary. This is especially true where violence is involved. It is admittedly within the power of the state to protect its own peace.

We find that the facts proven in this case clearly show that the exceptions to pre-emption set forth by our Court of Appeals in its order remanding this case have been clearly proven before.

The policy of our state as to stranger picketing is set forth in **Chucales v. Royalty, 164 Oh St 214.** The Syllabus is clear and the reasoning of Judge Taft is quite logical. True, the facts show an intrastate violation. Nevertheless, the policy is clear as shown in **Crosby v. Rath, 136 Oh St 352.** It must be kept in mind that in Crosby, certiorari was refused by the Supreme Court. In doing so, we are obeying the mandate of our Court of Appeals, which we must do under the proven facts.

The finding will, therefore, be for the plaintiff and the injunction will be against all stranger picketing. In so doing, we do not in anyway presume to deny strikers the right of peaceful picketing which is the determined policy of our state. We have no strike here but we have a stranger who is attempting to force an employer to enter into a contract against his will, which is proscribed by our law.

We could stop right here but I am impelled to add an observation. Counsel for Amalgamated called Richman's method of operating its factory "paternalistic feudalism." There is nothing evil in being paternal,—in treating one's employees as being a part of the family. It is when the father becomes arbitrary or autocratic that the situation becomes objectionable and may cause rebellion. Germany under the Kaiser before World War I, had advanced economically and otherwise farther than any other nation and remained at the top till the leader began to think of "Ich und Gott." Mussolini and Hitler did well until they began to think of themselves as world rulers. Then disaster came. That is why democratic action is more cumbersome but safer in the end. The people will right themselves finally.

But we do not have that case here. There is no strike.

In the early part of this century men in the coal mines under John Lewis (not John L. for whom we also have respect) struck and fought for a decent wage. Labor in those days obtained their raise in pay, literally, through "blood and tears." Then labor began its march upwards. The employees of Richman have marched upwards also and are perfectly satisfied with their lot. If they become disatisfied in any way, they also will rebel.

As to the campaign for adoption of the union label, a slower, but perhaps sounder, campaign has been proposed as shown in last week's

official union paper of this city. If the rank and file of labor follow that plan, we will not have rule by an oligarchy, which may be as disastrous as rule by an autocracy.

In any event, the Supreme Courts, when this reaches those tribunals, will have a clear cut decision to sustain or reverse.

A Journal Entry may be drawn in conformity with this opinion.

No. 641936.   Decided October 4, 1956.

## JUDGMENT

By NICOLA, J.

This cause duly came on for trial on the merits, and was heard on the pleadings, the evidence, and the arguments of counsel, and was submitted to the Court; and

On consideration thereof the Court finds on the evidence for plaintiff and that the statements and allegations in the petition are true; that the defendants, acting at the instance and under the direction and control of the defendant Amalgamated Clothing Workers of America, have entered into, and have carried out an unlawful plan or conspiracy against Plaintiff as alleged in the petition herein; that the picketing complained of in the petition is in furtherance of such plan or conspiracy, which the Court finds is contrary to the public policy of the State of Ohio and is unlawful; that as a result of such plan or conspiracy, plaintiff has been, and, unless an injunction is granted as prayed, will continue to be, irreparably damaged, and is without adequate remedy at law; that the Court has jurisdiction of the parties hereto and the subject matter herein, and plaintiff is entitled to the relief prayed for.

Upon consideration of the defendants' motions made at the trial to dismiss plaintiff's petition, dissolve the temporary injunction or, in the alternative, to modify said injunction, and to limit the temporary or any other injunction to cover peaceful picketing or any other activities in the State of Ohio, all of which were heard, argued and submitted to the Court, the same are hereby overruled.

It is, accordingly, ORDERED, ADJUDGED AND DECREED that the temporary injunction heretofore granted in this cause be made permanent and that the bond provided for therein be and the same hereby is cancelled; that defendants and each of them named in the petition, the respective branches, locals, officers, members, agents and employees of the defendant unincorporated associations, or any of them, all persons associated with or acting in concert with the defendants or any of them with respect to the acts herein enjoined, and all others to whom knowledge of this order shall come, be and they and each of them are hereby perpetually enjoined and restrained from picketing, or from causing, encouraging, or assisting to cause to be picketed, any of the stores of plaintiff wherever located, and from doing any and all other acts or things, in furtherance of said plan or conspiracy.

Further considering, it is ordered that plaintiff recover from defendants its costs herein expended, taxed at $106.83, judgment for which is hereby rendered plaintiff against defendants.

Exceptions to defendants. Appeal Bond $1,000.